Filed 1/15/16  P. v. Vulgamore CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>BRYAN ALLEN VULGAMORE,<br><br>        Defendant and Appellant. | A142910<br><br>(Alameda County<br>Super. Ct. No. H52799) |

Appellant Bryan Allen Vulgamore appeals from his conviction, following a jury trial, of second degree murder.  We affirm.

BACKGROUND

On January 8, 2002, William Garcia arrived home from work shortly after 4 p.m. He lived with his daughter, Cecilia Garcia, and his granddaughter.[1]  Soon after he arrived home, he discovered Cecilia in a locked bathroom, lying face down in the shower, naked. The water was running and there were four or five inches of standing water inside the shower pan.  A responding paramedic pronounced her dead.

Earlier that day, about 10:30 a.m., Cecilia had called her friend Theresa Pacheco, asking for a ride to a doctor's appointment.  Pacheco arrived at Cecilia's house at 11:11 a.m.  No one answered her knocks at the door or repeated phone calls.  Before she left,

_____

[1] For convenience, we refer to William and Cecilia Garcia by their first names.  No disrespect is intended.

1

Pacheco saw a curtain inside the door window swaying as if someone had brushed against it. Cecilia never appeared at her doctor's appointment.

Appellant was dating, and had a child with, one of Cecilia's cousins. He was staying with Gary Raridon—another of Cecilia's cousins—and Raridon's girlfriend, Belinda Cisneros. On January 8, 2002, Cisneros returned home about 8:40 a.m. after taking one of her children to school. Appellant was there. At 9:30 a.m., Cisneros told appellant he had to leave for the day. Appellant left about 10:15 a.m. He returned between 2 and 2:30 p.m. His clothes were wet from the chest down.[2] He told Cisneros that he fell in a creek.

At a service for Cecilia on January 13, appellant told William that he had seen Cecilia at her house on the morning of her death. William told the police and appellant subsequently agreed to be interviewed.[3] In a written statement made during this interview, appellant said he called Cecilia at 9 a.m. on the morning of her death. He asked to come over because he wanted to see some puppies at her house that he might be interested in. Cecilia said he could come over but told him to hurry because she had to leave. Appellant called a friend, Monica Quinones, and asked her to pick him up at Cecilia's house about 10 a.m. Appellant then walked to Cecilia's house, arriving about 9:35 a.m. After he saw the dogs, appellant and Cecilia talked for a few minutes. Cecilia said she had to take a shower, and appellant waited outside for Quinones. Quinones picked him up about 9:50 or 10 a.m. with her boyfriend, Tony Bagorio. Appellant spent most of the day at Quinones' house.

The police subsequently interviewed Quinones and Bagorio. Initially, both told the police they had picked up appellant at Cecilia's house that morning. However, both soon recanted. A few weeks after her initial interview, Quinones told the police her first statement was a lie. She testified Bagorio had told her to lie to the police to corroborate

---

[2] Appellant put on a witness who testified he saw appellant at 12:30 p.m. on the day of Cecilia's death, and appellant's clothes did not appear wet.

[3] A video of appellant's interview was played for the jury.

2

appellant's story. In a February 13, 2002 interview, Bagorio began by repeating his initial story, but then admitted it was a lie and said appellant asked him to lie.[4] He said appellant told him the following: on the morning in question appellant and Cecilia were "messing around" ("kissing and stuff") when they heard a knock at the door. When Cecilia went to answer the door, appellant grabbed her and she slipped and fell. Cecilia hit her nose on the corner of the sink when she fell, had blood coming out of her nose, and appellant could not hear her breathing. Appellant pulled her into the shower to wash his saliva and DNA off.[5] Appellant told Bagorio that at the time of Cecilia's death, he had been up for three days taking methamphetamine.

At trial, Bagorio testified that his statement about picking appellant up from Cecilia's house was a lie, and his subsequent statement about what appellant told him was also a lie. He testified he lied in the February 13 interview because the police were pressuring him and feeding him information from their investigation. The police interviewers denied these tactics.

Dr. Thomas Rogers performed the autopsy. Cecilia had multiple blunt injuries on her face, arms, and legs.[6] The injuries were consistent with being hit in the face and forcibly restrained. A bone in her neck was broken and she had areas of hemorrhage in her neck. These injuries were consistent with manual strangulation. There was water in her lungs and chest cavity, indicating that she was alive when exposed to water. Dr. Rogers opined that the cause of death was asphyxiation due to drowning and blunt injuries to the neck. Her injuries were not consistent with a simple slip and fall.

---

[4] One of Bagorio's February 13, 2002 interviewers testified at a conditional hearing. The video of that testimony was shown to the jury.

[5] Bagorio also told the police appellant said he poured water on Cecilia to try to wake her up.

[6] Other witnesses testified Cecilia did not have bruises or other visible injuries in the two days before her death.

DISCUSSION

I. *Involuntary Manslaughter Instruction*

The jury was instructed on first and second degree murder.  At trial, appellant requested the jury also be instructed on involuntary manslaughter.  The trial court refused the instruction, finding no substantial evidence supported it.  Appellant challenges this ruling on appeal.

Involuntary manslaughter is a lesser included offense of murder.  (*People v. Thomas* (2012) 53 Cal.4th 771, 813 (*Thomas*).)  "An instruction on a lesser included offense must be given only if there is substantial evidence from which a jury could reasonably conclude that the defendant committed the lesser, uncharged offense but not the greater, charged offense."  (*Ibid.*)  We need not decide whether the failure to instruct on involuntary manslaughter was error, because any error was harmless.

"The failure to instruct on a lesser included offense in a noncapital case does not require reversal 'unless an examination of the entire record establishes a reasonable probability that the error affected the outcome.'  [Citation.]  'Such posttrial review focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration.  In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' "  (*Thomas, supra,* 53 Cal.4th at p. 814, fn. omitted.)

Appellant argues the jury could have found that he and Cecilia were "messing around"; she slipped and fell, either after trying to push appellant away or during a struggle with appellant after she tried to get away; and appellant placed her in the shower to try and revive her.  Assuming there is substantial evidence to support this theory, the evidence is extremely weak.  Among other things, Dr. Rodgers unequivocally testified Cecilia's injuries were not consistent with a slip and fall, and Cecilia was found lying face down in the shower with the water running—not a position that someone hoping to

revive her would leave her in.  We find no reasonable probability that the verdict would have been more favorable to appellant had the jury been instructed on involuntary manslaughter.

II. *Pacheco's Testimony About Cecilia's Statements*

Pacheco testified that during her telephone conversation with Cecilia at 10:30 a.m. on January 8, 2002, Cecilia told Pacheco "[s]he had just got up . . . ."  Appellant argues this testimony was inadmissible hearsay.

We need not decide whether appellant forfeited this claim because we find any error harmless.  As appellant notes, in his closing argument the prosecutor argued appellant's statement to the police was unreliable in part because it conflicted with Cecilia's statement that she got up just before 10:30 a.m.  However, the prosecutor pointed to numerous other inconsistencies, including Cisneros' testimony that appellant did not leave her house until 10:15 a.m. and returned later with wet clothes; Quinone's and Bagorio's testimony that they did not pick up appellant at Cecilia's house; medical evidence indicating the injuries were the result of an assault; and Bagorio's statements to the police about appellant's admissions.  Cecilia's statement was not a centerpiece of the prosecution's case, or even substantially relied on.  Indeed, appellant asserts in other parts of his brief that "[t]he major evidence against [a]ppellant was a series of statements made to the police by Tony Bagorio" and "[t]he prosecution's case largely, if not totally, turned on the credibility of Tony Bagorio."  It is not reasonably probable that the result would have been more favorable had the statement been excluded.  (*People v. Kopatz* (2015) 61 Cal.4th 62, 86–87 [improperly admitted hearsay reviewed for harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836].)[7]

---

[7] Appellant refers to the standard of prejudice for confrontation clause violations. However, the statement was not testimonial and its admission therefore did not violate the confrontation clause.  (See *People v. Dungo* (2012) 55 Cal.4th 608, 619 [testimonial statements must "be made with some degree of formality or solemnity" and have a "primary purpose pertain[ing] in some fashion to a criminal prosecution"].)

III.  *Officer Opinion Testimony*

Appellant contends certain testimony from one of the investigating officers constituted improper opinion testimony.  We reject this challenge.

A.  *Background*

After Bagorio testified, the prosecutor questioned one of the investigating officers about his February 13, 2002, interview with Bagorio:

"Q. Now, [Bagorio] said that there were times when you were feeding him information from the investigation, telling him things that you knew from the investigation, and that he just took those things and made his [February 13] statement using those things.

"A. Oh, absolutely not.

"Q. Why do you say absolutely not?

"A. Absolutely not.  Because in order to get to the truth, the person responsible for committing any crime would have knowledge of that.  And if we have put information as to what happened, then we're not going to get to the truth, you know.  We're looking to have somebody independently tell us what happened."

A few questions later, the following exchange took place:

"Q. . . . Mr. Bagorio said the detective would throw out a scenario like Cecilia fell, she hit her nose on the sink, and then maybe he dragged her into the shower and then ran out the side door.

"A. No.

"Q. Did you ever give him a scenario like what might have happened?

"A. Not at all. Not at all.

"Q. Is that something you would do in an investigation?

"A. No, not at all.

"Q. Why not?

"A. Because we're out to look for the truth. And if Mr. Bagorio had that information, then he must have heard it from the person responsible."

6

B. *Analysis*

Appellant contends the officer's statements about looking for "the truth" constituted improper opinion testimony that Bagorio was telling the truth when he implicated appellant, and his statements about "the person responsible" constituted improper opinion testimony that appellant was the person responsible.

Assuming the testimony constituted improper opinion testimony, any error was harmless. A similar argument was raised, and rejected, in *People v. Riggs* (2008) 44 Cal.4th 248, in which the investigating officer opined that the defendant's exculpatory statements were untruthful and that the defendant was guilty. (*Id.* at p. 300.) Our Supreme Court found any error harmless: "Investigator Pina's testimony that he believed defendant was guilty as charged and was untruthful when he denied responsibility for the crimes did not present any evidence to the jury that it would not have already inferred from the fact that Pina had investigated the case and that defendant had been charged with the crimes. There was no implication from the questions or answers that Pina's opinions were based upon evidence that had not been presented to the jury. [Citation.] In addition, we see nothing in the record that would lead us to conclude that the jury was likely to disregard the instructions it received concerning its duty to decide the issues of credibility and guilt based upon its own assessment of the evidence, not the opinions of any witness. The jury's exposure to the unsurprising opinions of the investigating officer that he believed the person charged with the crimes had committed them, and was untruthful in denying his guilt, could not have influenced the verdict . . . ." (*Id.* at pp. 300–301.) Similarly here, the jury was instructed on its duty to determine the facts according to the evidence and on determining witness credibility. The officer explained the basis for his opinions and gave no indication they were based on extra-record evidence. The jury was not likely to be surprised that one of the investigating officers

believed Bagorio was telling the truth when he implicated appellant and believed appellant was the responsible party. Any error in allowing the testimony was harmless.[8]

IV. *Mistrial Motion*

Appellant argues the trial court erred in denying his motion for a mistrial. We disagree.

A. *Background*

During Bagorio's direct examination, the prosecutor asked a series of questions about the details of his initial story to the police; specifically, whether he discussed them in advance with appellant or Quinones and why certain details were included. The following exchange took place during questioning about a specific detail, that Quinones leaned her seat forward to allow appellant to get in the back seat:

"Q. So I'm just wondering why you would add that kind of little detail about [Quinones] leaning her seat forward and that kind of thing?

"A. I don't know. [¶] Can I ask [appellant] a question?

"THE COURT: No. Do you need a break?

"THE WITNESS: No. I just wanted to know why he didn't -- or if he wants to say something --

"THE COURT: It's okay. You don't need to say anything. [¶] Go ahead."

At the next recess, the following exchange took place:

"[DEFENSE COUNSEL]: When Mr. Bagorio was on the stand there was a time there when he asked I believe if he could ask [appellant] a question. I think that was what he said on the stand. And he started to say something, and before your Honor cut him off I didn't hear what he said. I was wondering if the Court could enlighten me on what he said.

"THE COURT: I don't know what he said. I wanted to cut him off because I didn't want him to ask him. I didn't want him to ask your client a question.

---

[8] Because of this conclusion, we need not decide the People's contention that appellant forfeited this argument.

8

"[DEFENSE COUNSEL]: Right.  That's what I was concerned about.  He said -- I thought he said something after that.  Since your Honor is right next to him, I was wondering if any words came out of his mouth as far as what that question was that he wanted to ask [appellant]."

The court had the reporter read the record.  Defense counsel then moved for a mistrial, arguing, "assuming that the jury heard that," the jury could conclude Bagorio wanted to ask appellant "possibly why did [appellant] put him in this situation or maybe why didn't [appellant] tell the truth."  The trial court denied the motion, explaining: "Clearly -- I didn't get what [the court reporter] got.  So I'm not -- I'm a pretty good listener, so I'm not sure that they even, juror seven, eight, one or two, or any of the jurors who are closest to the witness, got his comments."

The trial court offered to admonish the jury.  Defense counsel asked to consider the offer; there is no record of counsel's final decision and it does not appear that any admonishment was issued.

B. *Analysis*

"A motion for mistrial is directed to the sound discretion of the trial court.  We have explained that '[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction.  [Citation.]  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' " (*People v. Jenkins* (2000) 22 Cal.4th 900, 985–986.)

Although appellant repeatedly asserts that Bagorio asked appellant a question, the record does not reveal a completed question.  When Bagorio began to frame the question he wanted to ask, the trial court cut him off and subsequently found the jurors did not even hear these comments.  Appellant's speculation about what question Bagorio wanted to ask does not render the trial court's ruling an abuse of discretion.[9]

---

[9] Because of this conclusion, we need not decide the People's contention that appellant forfeited this argument.  In addition, appellant contends Bagorio's statement violated his constitutional right not to testify but cites no authority for this proposition; we therefore

9

V. *Prosecutor's Closing Argument*

During his closing argument, the prosecutor read to the jury, over defense objection, a newspaper article summarizing his opening statement. Appellant contends this was error because the article was not evidence; the article was hearsay; by reading the article, the prosecutor turned himself and the reporter into witnesses; and the prosecutor was vouching for the credibility of prosecution witnesses.

We find any error harmless. The jury was told the article was a summary of the prosecutor's opening statement—which they had already heard—and the article itself so stated. The prosecutor explained he was reading it to the jury because it was a "brief and succinct" statement of the prosecution's case, and noted the reporter "expressed no opinions about the strength or weakness" of either side's opening statement. The factual assertions the article attributed to the prosecutor had support in the record.[10] The jury was instructed that the attorneys statements were not evidence. Any error was harmless under any standard.

VI. *Motion to Dismiss*

Before trial, appellant moved to dismiss the case because the police lost video recordings of Bagorio's February 13, 2002 interview.[11] The prosecutor represented that

___

decline to consider it. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [" 'The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.' "].)

[10] Appellant argues the article's recitation of the prosecutor's argument that Cecilia was strangled lacks evidentiary support because Dr. Rogers did not conclusively opine that she was strangled. However, Dr. Rogers testified her injuries were consistent with strangulation and in closing argument, "prosecutors have wide latitude to discuss and draw inferences from the evidence presented at trial. ' "Whether the inferences the prosecutor draws are reasonable is for the jury to decide." ' " (*People v. Thornton* (2007) 41 Cal.4th 391, 454.)

[11] Appellant's pre-trial motion included other pieces of lost evidence. On appeal, appellant does not challenge the trial court's ruling with respect to this evidence.

an "exhaustive search" for the recordings had been unsuccessful.[12]  The trial court denied appellant's motion.  Appellant challenges this ruling on appeal.

" 'Law enforcement agencies have a duty, under the due process clause of the Fourteenth Amendment, to preserve evidence "that might be expected to play a significant role in the suspect's defense." [Citations.]  To fall within the scope of this duty, the evidence "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." [Citations.]  The state's responsibility is further limited when the defendant's challenge is to "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." [Citation.]  In such case, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." ' " (*People v. Carter* (2005) 36 Cal.4th 1215, 1246.)  " 'On review, we must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support its ruling.' " (*Ibid.*)

Appellant speculates the lost videotapes were exculpatory because Bagorio's demeanor on the tapes could have shown he was under the influence of drugs at the time, and therefore susceptible to the interviewing officers' demands.[13]  Such speculation is not sufficient to demonstrate the lost evidence possessed an apparent exculpatory value. (*People v. Cook* (2007) 40 Cal.4th 1334, 1349 [speculation that destroyed evidence "might have" possessed exculpatory value insufficient].)  There was no evidence the police acted in bad faith in losing the evidence, and appellant does not argue otherwise. The trial court's denial of appellant's motion to dismiss was not an abuse of discretion.[14]

---

[12] Written police reports extensively recorded the substance of the interview.

[13] Bagorio testified to his drug use around the time of the interview, and told the interviewer he had used drugs and alcohol in the prior 24 hours.

[14] Appellant contends the cumulative impact of the above errors deprived him of a fair trial.  We have either rejected appellant's claims of error or found that any errors,

DISPOSITION

The judgment is affirmed.

_____
SIMONS, J.

We concur.

_____
JONES, P.J.

_____
NEEDHAM, J.

---

assumed or not, were not prejudicial.  "Viewed as a whole, such errors do not warrant reversal of the judgment."  (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)